UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

VIRGINIA A. VIILO,

        Plaintiff,

        v.                                Case No. 05-C-0216

CITY OF MILWAUKEE,
SUPERVISORY PERSONNEL,
KEVIN EYRE,
MONTELL D. CARTER,
POLICE OFFICERS,

        Defendants.

---

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT AND SETTING SCHEDULING CONFERENCE

Virginia Viilo sues the City of Milwaukee and police officers under 42 U.S.C. § 1983, asserting unlawful seizures of her and her personal property, violation of her due process rights, and failure on the part of the City to properly train its officers. (Pet. for Removal, Ex. Compl. & Jury Demand at 6-11.) The facts underlying the complaint concern the shooting of Viilo's dog by police officer and defendant Montell D. Carter. The City of Milwaukee and defendant officers Carter and Kevin Eyre move for summary judgment.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant bears the initial burden of demonstrating that summary judgment should be granted. *Id.* at 323. Once this burden is met, the opposing party must designate specific facts to support or

defend each element of the cause of action, showing that there is a genuine issue of material fact for trial. *Id.* at 322-24. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is genuine, the opposing party must present specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the opposing party's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Where the record is taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255.

CIVIL L.R. 56.2

In this district, a party moving for summary judgment must file either a stipulation of facts or proposed findings of fact or a combination of both. Civil L.R. 56.2(a). The opposing party must submit a "specific response to the movant's proposed findings of fact . . . . The response must refer to the contested finding by paragraph number and must include specific citations to evidentiary materials in the record which support the claim that a dispute exists." Civil L.R. 56.2(b)(1) (E.D. Wis.). Further, the opposing party "may present additional factual propositions deemed to be relevant to the motion*,"* Civil L.R. 56.2(b)(2) (E.D. Wis.), including allegedly undisputed material facts or additional disputed material facts that preclude summary judgment, *id.* These propositions "must be set out in numbered

paragraphs, with the contents of each paragraph limited as far as practicable to a single factual proposition." Civil L.R. 56.2(a)(2), (b)(2).

Although Viilo responded to the defendants' proposed findings of fact, she presented no proposed findings of fact of her own with her opposition brief. Instead, she presented a twenty-eight page statement of facts section in her brief, which was not in proper form. Further, proposed facts were discussed in the argument section of Viilo's brief. After defendants pointed out this error in their reply brief, Viilo attempted to submit proposed findings of fact, stating that they simply restated the facts in her brief using numbered paragraphs as required by Civil L.R. 56.2. (Senatori Letter filed 7/21/06.) Defendants object to consideration of these tardy submissions.

With due regard for the local rules and the aforementioned matters, the court will not consider Viilo's proposed findings of fact submitted after summary judgment briefing was complete. Nor will the court consider the proposed facts offered in Viilo's brief, as they are not in proper form under Civil L.R. 56.2. Thus, the court will look to Viilo's responses to defendants' proposed findings of fact in determining whether Viilo has established a genuine question of material fact which will preclude summary judgment.

In addition, the court will disregard replies the defendants filed after Viilo responded to their (defendants') proposed findings of fact. The local rules do not provide for such replies. Some judges in this district, may have considered such replies or suggested that they might be proper, *e.g., Williams v. Brann*, No. 02-C-940, 2006 WL 2401112, *3 (E.D. Wis. Aug. 18, 2006) (Stadtmueller, J.); *Jackson v. Racine County*, No. 02-C-936, 2005 WL 1767647, *6-*7 (E.D. Wis. July 25, 2005) (Goodstein, M.J.). However, Civil L.R. 56.2 provides only for initial proposed findings of fact by the movant, specific responses to the initial

3

proposed findings of fact plus additional proposed findings of fact by the nonmovant, and a response *to the nonmovant's additional proposed findings* by the movant. The general provision in Civil L.R. 7.1(c), which permits a reply brief, references Civil L.R. 56.2 for "additional summary judgment motion procedures." Thus, Rule 7.1(c)'s reference to a reply brief and, if necessary, affidavits in reply does not somehow permit replies to proposed findings of fact. The reference in Rule 7.1(c) to reply affidavits makes sense respecting support for responses to the nonmovant's additional proposed findings of fact, but does not authorize replies to the nonmovant's response to the movant's proposed findings of fact.

## STATEMENT OF FACTS

At all times pertinent to this case, Montell Carter was a police officer acting in that capacity and Kevin Eyre was a sergeant and police supervisor acting as such. (Def.'s Br. in Supp. at 3, ¶ 3 The Parties.[1]) Both were employed by the City of Milwaukee. (*Id.*, ¶¶ 2-3 The Parties.)

On August 15, 2004, Virginia Viilo owned a seven-year-old labrador retriever/springer spaniel mixed breed dog named "Bubba." (*Id.*, ¶ 1 The Events; Pl.'s Resp. to Def.'s Proposed Findings of Fact ("Pl.'s Resp.") ¶ 1 The Events.) Bubba had a history of jumping a three and one-half foot fence and leaving Viilo's yard, sometimes more than once per day. (Def.'s Br. in Supp. at 3, ¶ 2 The Events.) Frequently, Bubba jumped the fence to

---

[1]Defendant's proposed findings of fact are found within their brief. Because the proposed findings of fact are within the brief, the court will cite to the page number as well as to the particular paragraph number. Because the proposed findings contain separate sections using some of the same numbering for paragraphs, if reference to a particular paragraph would be unclear, the court gives the section heading for the proposed finding.

Unless otherwise noted, a proposed finding of fact was not disputed for the point cited and the court's citation to the proposed finding of fact incorporates plaintiff's agreement with it. A citation to both a proposed finding of fact and the response to it generally indicates that the proposed finding has been used as modified by the response.

4

visit neighbors and children nearby.  (Pl.'s Resp. ¶ 3 The Events.) During the seven years that Viilo owned Bubba, no neighbor complained of Bubba's visits.  (*Id.*)  Because Viilo had received a citation for a barking dog after tying Bubba to a tree in the yard, she did not tether him.  (Def.'s Br. in Supp. at 3, ¶ 3 The Events; Pl.'s Resp. ¶ 3 The Events.)

During the evening of August 15, 2004, Carter and other police officers responded to 2229 South 20th Street, Milwaukee, to check for a subject wanted by the Washington County Sheriff's Department on felony charges, related to a stabbing and kidnaping.  (Def.'s Br. in Supp. at 4, ¶ 5; Pl.'s Resp. ¶ 5.)  According to Rodney Klotka of the Milwaukee Police Department's Fugitive Apprehension Unit, a confidential informant stated to him that the suspect, Joseph Arendt, had just walked into 2229 South 20th Street.  (Def.'s Br. in Supp. at 4, ¶¶ 6-7.)  Within an hour of the call, officers responded to that address.  (*Id.*)  Arendt was known to carry a weapon and to be accompanied by a pit bull.  (*Id.* ¶ 7.)

Klotka, Carter, and officers George Schad, Ala Awadallah, Walter McCullough, and Denise Hewitt proceeded to 2229 South 20th Street, parked their vehicles away from the residence, and approached the home from the front along 20th Street.  (*Id.* ¶ 9.)  Because Arendt was known to be accompanied by a dog, Carter armed himself with a department-issued shotgun, which had been located in his unmarked squad car.  (*Id.* ¶ 10; Pl.'s Resp. ¶ 10; Carter Dep. at 28; Klotka Dep. at 14-15; Carter Aff. ¶ 8.)

Klotka and Schad approached the house in front of Carter and walked toward the front steps.  (Def.'s Br. in Supp. at 5, ¶ 11.)  At that time, Viilo, her mother, her roommate Roland Klitzka, guests, and Bubba, were in the backyard of the house.  (*Id.* ¶ 12.)  As Klotka and Schad approached the house, Carter saw Bubba, a black and white dog, jump the gated fence located across the narrow gangway that ran along the south side of the house, leading

to the backyard. (*Id.* ¶ 13.) Carter saw the dog run toward Klotka and Schad. (*Id.* ¶ 14.) Bubba was exposing his gums and teeth, and was barking and growling (*id.* ¶ 15), but did not then try to attack the officers (Pl.'s Resp. ¶¶ 15, 16.[2]) Carter observed Klotka and Schad attempt to move from Bubba toward the steps leading to the front door, and observed that there was no plausible means for Klotka and Schad to escape the dog because of its speed. (Def.'s Br. in Supp. at 5, ¶ 16.[3])

Fearing for the safety of Klotka, Schad, himself, and the other officers, Carter raised his shotgun and fired two shots at the dog. (*Id.* ¶ 17.[4]) Carter discharged his weapon while standing near the corner of the neighbor's house to the south, near the utility meter as depicted in photograph 1 attached to his affidavit, and facing 2229 South 20th Street. (*Id.* at 6, ¶ 18.) Photograph 1 shows the front steps of the house and the gangway leading to the backyard. (M. Carter Aff. Photo 1.)

---

[2]Viilo disputes the defendants' proposed finding that Bubba's teeth and gums were exposed and that he was barking and growling, but asserts only that a neighbor observed that Bubba did not try to attack the officers and was a friendly dog who would never hurt anyone. (Pl.'s Resp. ¶ 15.) That Bubba did not try to attack the officers does not negate the finding that Bubba's teeth and gums were exposed and that he was barking and growling. Bubba's history as a friendly dog does not negate the finding, either. *See, e.g., Pfeil v. Rogers*, 757 F.2d 850 (7th Cir. 1985) ("The fact that the dogs had been gentle in the presence of two persons on another occasion does not controvert the fact that they allegedly threatened Ducommun on other occasions in the park and on Rob's property by barking, growling, and snapping at him.").

[3]While Viilo disputes this finding, she presents no discussion or citation to evidence contradicting that this is what the officers did or suggest that there was a way for the officers to avoid the dog. (*See* Pl.'s Resp. ¶¶ 15, 16.)

[4]Viilo disputes this proposed finding of fact but points only to the evidence that Bubba did not try to attack the officers and that he was a friendly dog who would never hurt anyone. (Pl.'s Resp. ¶ 17.) Her cited evidence does not contradict Carter's affidavit regarding his fear for the safety of the other officers and himself. (*See* Carter Aff. ¶ 16.) Viilo can argue that Carter's fear was unjustified, but she does not negate Carter's claim that he was fearful or that he fired his weapon as a result of that fear.

Carter saw Bubba run to the front of the house, in the area of some bushes located under the front picture window , after it was struck with at least one of his two shots. (*Id.* ¶¶ 19-20.)

According to Carter, the initial two shots were fired to protect Klotka, Schad, himself, and other officers from being bitten or otherwise injured by the animal. (Def.'s Br. in Supp. at 8, ¶ 36; Pl.'s Resp. ¶¶ 27, 36; Carter Aff. ¶ 36.[5]) Klotka considered himself the "team leader," during the attempt to apprehend Arendt at the residence. (Def.'s Br. in Supp. at 8, ¶ 40.) After the dog was shot, Klotka proceeded to the backyard area; made contact with Viilo and explained why police officers were present and why the dog was shot. (*Id.* ¶ 41.) Within minutes of the initial shooting Viilo identified herself as Bubba's owner to several of the police officers at the scene. (Pl.'s Resp. ¶ 34; Viilo Decl. ¶ 13; Senatori Decl. Ex. H (Klotka Dep.) at 28.)

Because Carter had fired his weapon, supervisors were called to the scene, pursuant to standard Milwaukee Police Department (MPD) protocol. (Def.'s Br. in Supp. at 8, ¶ 21.) After twelve minutes, Sergeant Eyre responded to the scene for the standard use-of-force investigation that results after an officer fires a weapon. (*Id.* ¶ 22; Pl.'s Resp. ¶ 22; Eyre Dep. Ex. 12.) During the wait, Carter maintained his position in the front of the residence and watched Bubba continuously. (Def.'s Br. in Supp. at 6, ¶ 23; Pl.'s Resp. ¶ 23.) According to Viilo's expert witness, who performed a necropsy on Bubba, after the initial shooting Bubba

---

[5]Viilo says she disputes this proposed finding of fact, but she points only to evidence regarding Bubba's condition when he came out of the bushes after being shot. (*See* Pl.'s Resp. ¶¶ 36, 27.) She points to no evidence contradicting Carter's intent while firing the first two shots, states that Carter's credibility is for the jury to determine, and does not present any evidence drawing Carter's credibility into question. *See Pfeil*, 757 F.2d at 863 ("[A]lthough summary judgment is usually not proper in a case involving a weighing of conflicting questions of motive and intent, summary judgment is proper where the plaintiff presents no indications of motive and intent supportive of his position." (internal quotation marks omitted)).

would not have posed any serious threat to officers or witnesses at the scene. (Pl.'s Resp. ¶ 23; Porter Decl. ¶ 10.)

While Carter remained in front of the residence, other officers went to the rear yard to continue looking for the suspect, Arendt. (Def.'s Br. in Supp. at 6, ¶ 24.) Carter observed that a large group of people began to gather across the street. (*Id.*)

After arriving at the scene, Eyre spoke with the officers on or near the public sidewalk. (*Id.* ¶ 25; Pl.'s Resp. ¶ 25; Eyre Dep. at 33-34; Eyre Aff. ¶ 6.) Eyre observed a black and white dog, wounded and bleeding, under the bushes in front of the residence, near a large picture window facing 20th Street. (Def.'s Br. in Supp. at 7, ¶ 26.) Next, Eyre began to walk south across the front of the property to further investigate the incident. (*Id.* ¶ 27.[6])

According to Eyre, Bubba existed the bushes with its gums and teeth exposed, growling and barking. (Def.'s Br. in Supp. at 7, ¶ 27; Eyre Aff. ¶ 8.) At this time, Eyre was in the area of the sidewalk and the edge of the front lawn, directly in front of 2229 South 20th Street. (Def.'s Br. in Supp. at 7, ¶ 29.)

Viilo maintained that Bubba was yelping, crying, whimpering and howling while crawling, scooting, trying to drag himself, and limping, or trying to use three paws to walk. (Pl.'s Resp. ¶ 27.) Sandra Carter, one of Viilo's neighbors (Senatori Decl. Ex. C at 12), submitted that Bubba was crying and went near Viilo's house, nudging the window attempting to get in, after being shot initially (*id.* at 34). He then "got up. And he started to go around the side, and this police officer that was on the side there, he raised his gun, and everybody

---

[6]The defendants' proposed finding of fact includes the proposition that Bubba came from the bushes with his gums and teeth exposed, growling and barking. Viilo objects, stating Bubba did not come out of the bushes with his gums and teeth exposed, growling and barking. (Pl.'s Resp. ¶ 27.) Viilo does not present any evidence contradicting Eyre's actions in walking south. (*Id.*)

8

started crying, they said, 'Please, don't shoot him.'" (*Id.* at 35.) Sandra Carter indicated that

Bubba was about nine feet from the window of the house at that time, in the front lawn area.

(*Id.*) Later, in questioning at her deposition, Sandra Carter confirmed that Bubba was heading

toward the officer. (*Id.* at 37.)

> During her depostion, Angela Fleischmann testified that after the initial shots
>
> Bubba was laying on the ground crying and yelping, and there was a bunch of cops standing over him or by him, and we stayed on the porch.
> And Bubba was still crying and yelping, lying on the ground, and he tried to get back into the side of the house, the gate to get back into his house, and that's when the police officer shot him again.

She indicated that when Bubba moved out from the front window area he headed toward the

walkway leading to the backyard gate. (*Id.* at 20.) Fleischmann further indicated that there

were two officers in the direction where Bubba was heading, and that Bubba was about three

feet from them. (*Id.* at 21-22.)

> Viilo's roommate, Roland Klitzka, stated that from the backyard he
>
> walked to the gate, [and] opened the gate, and the gate makes a metal sound. And I was calling the dog, and as I opened up the gate to go out the front, I could see the dog move from in front of the house – from what I seen, moving from the front of the house to the side. He just kind of like slowly moved over. And when he saw me, he sat down, and he looked me right in the eye, and he just – in the eyes, and he was just looking at me.

(Senatori Decl. Ex. G at 47.) Witness Wayne Ruh said that Bubba had been located in the

bushes, but then, "for some reason, it decided or I don't know what made it decide, but it

wanted to go into the yard." (Senatori Decl. Ex. K at 19.)

> Officer Schad stated that when the dog came from the bushes "it was moving

very erratically. . . . It was almost hopping and kind of dragging itself at the same time."

9

(Senatori Decl. Ex. L at 26.)  Schad said that the dog was headed for Eyre.  (*Id.* at 23.)

Further, he said that "for being injured, it was moving pretty quick."  (*Id.* at 27.)  The dog

"wasn't like limping over to him like slow.  It was very erratic in its movements."  (*Id.*)[7]

Thus, although Klitzka's testimony that Bubba was looking him in the eye

controverts Eyre's statement that Bubba's teeth were bared at him, and there is conflicting

evidence as to how fast Bubba was moving, it is undisputed that Bubba headed in the general

direction of officers Carter and Eyre after leaving the bushes.  Photograph 1, which depicts

the gangway and gate, shows the approximate area where Carter stood, confirms the

walkway to which Bubba may have been headed was near Carter's location.  Also, the expert

who conducted a necropsy on Bubba stated that, Bubba could not then have charged at

anyone with the intent to attack, due to the injuries caused by the initial shots.  (Pl.'s Resp.

¶ 27; Porter Decl. ¶¶ 9-10.)

According to Eyre, he began to pull his weapon because he feared for his

safety.  (Def.'s Br. in Supp. at 7, ¶ 28; Pl.'s Resp. ¶ 28.[8])  But, he realized that if he fired his

weapon the bullets might ricochet and injure people in the area.  (Def.'s Br. in Supp. at 7, ¶

28; Pl.'s Resp. ¶ 28.[9])

---

[7]Viilo also cites the deposition testimony of neighbor Wanda Centeno at pages 17 and 19. Centeno stated that Bubba was howling and crawling and trying to drag himself back to the yard, but it appears she was describing what Bubba did after the first two shots, not after he came out of the bushes.  (*See* Senatori Decl. Ex. D at 17, 19.)

[8]Viilo disputes this finding of fact based on Bubba's condition as noted by witnesses and her expert, and contends that a jury must judge Eyre's credibility.  (Pl.'s Resp. ¶ 28.)  Other than unsupported questioning of Eyre's credibility, Viilo does not present anything contradicting Eyre's statement that he feared for his safety.

[9]Viilo states she objects to this proposed finding of fact but provides no discussion or citation to evidence contradicting Eyre's assessment of the possible consequences of firing his weapon.  (*See* Pl.'s Resp. ¶ 28.)

10

Eyre observed that Carter had his shotgun at the ready and was in a better tactical position. (*Id.* ¶ 30) Therefore, he ordered Carter to shoot Bubba. (*Id.*) Consequently, Carter shot the dog, causing it to drop to the ground. (*Id.* ¶ 31.) Eyre observed that Bubba was shot in the chest area, appeared to be in great pain and was fatally wounded. (*Id.* ¶ 32.) Eyre then ordered Carter to fire again, to put Bubba down. (Def.'s Br. in Supp. at 7, ¶ 33; Pl.'s Resp. ¶ 33.) Eyre maintains that given the degree of blood and injury that he observed, he ordered Carter to fire the final shot so that Bubba would not suffer unnecessarily. (Def.'s Br. in Supp. at 7, ¶ 33; Pl.'s Resp. ¶ 33; Eyre Aff. ¶ 14.) However, the "use of force" report on the incident, indicates that four police witnesses said the final two shots occurred because Bubba had his gums and teeth exposed; three of those witnesses said that they saw no means of escape or that the dog was charging. None said the fourth shot was to prevent Bubba's suffering. (Pl.'s Resp. ¶ 33; Senatori Decl. Ex. T at 3-4.) On the other hand, Carter said he fired the third shot intending to protect Eyre, himself, and other officers, and that the fourth shot was intended to put the animal down because it was in great pain and fatally wounded. (Def.'s Br. in Supp. at 8, ¶ 37; Pl.'s Resp. ¶ 37, 27.)

Carter knew before the third and fourth shots that Bubba was not a pit bull and was told by the crowd after the initial shot that Bubba was not a vicious dog. (Pl.'s Resp. ¶ 34; Senatori Decl. Ex. B at 33-34, 43-44.) However, at that time Carter did not know if Arendt had been found, and did not know the results of any investigation by the officers who had gone to the rear of the house. (Def.'s Br. in Supp. at 7-8, ¶ 34; Pl.'s Resp. ¶ 34.[10]) Thus, he

---

[10]Viilo objects to this proposed finding, but her objection is off-point. That Bubba was not Arendt's dog does not mean that Arendt could not have been in or behind the house.

was unaware that Bubba belonged to Viilo or that Bubba was not Arendt's dog. (Defs.' Br. in Supp. at 8, ¶ 35; Carter Aff. ¶ 35.[11])

Within minutes of the initial shot, Viilo told officers she did not know Arendt. (Pl.'s Resp. ¶ 38.) Nevertheless, Viilo and the other people with her were detained in her backyard while officers determined if Arendt was in her residence. (Def.'s Br. in Supp. at 8, ¶ 38.[12]) The officers did not let her go into her house or front yard and did not let her call a veterinarian. (Pl.'s Resp. ¶ 38.)

Eyre was acting as a supervisor at the scene. (Pl.'s Resp. ¶ 39.) However, neither Carter nor Eyre was present in the backyard while Viilo was detained there; they were located at the front of the residence and were not involved with any act or decision to detain Viilo in the backyard. (Def.'s Br. in Supp. at 8, ¶ 39; Pl.'s Resp. ¶ 39.[13]) Klotka did not allow Viilo to leave the backyard and go to Bubba inasmuch as he did not want Viilo to be injured by the dog, the scene was not secure and it had not been confirmed whether Arendt was in

---

[11]Viilo asserts in response to proposed finding ¶ 35 that this fact is disputed, but the only evidence she presents on this matter is that between the second and third shots Carter realized that the dog was not a pit bull and that Viilo told officers within minutes that she was Bubba's owner. In her declaration Viilo fails to state that she told *Carter* that the dog was hers and she admits that she did not go into the front yard, where Carter was located. (Viilo Decl. ¶ 13.) Thus, she does not refute defendants' proposed finding and evidence. She also contends that Carter's credibility is a matter for the jury, but again presents no evidence drawing Carter's credibility into question.

[12]Viilo says she disputes this proposed finding, but her response is off-point. (Pl.'s Resp. ¶ 38.) Whether she told officers she did not know Arendt does not negate that the officers detained her while they checked out her residence. The officers were not required to stop the search based on her claim that she did not know Arendt. Moreover, Viilo's mother gave officers permission to search the residence. (Def's Br. in Supp. at 9, ¶ 44)

[13]Viilo says she disputes this proposed finding of fact, but again her response – that Eyre was a supervisor and talked with officers at the front of the house and that Carter was told Bubba was friendly – is off-point. (*See* Pl.'s Resp. ¶ 39.) Eyre and Carter both stated under oath that they were not involved with the act or decision to detain Viilo in the backyard. (Eyre Aff. ¶ 19; Carter Aff. ¶ 39.) Viilo presents no evidence in response indicating Carter and Eyre were anywhere other than the front yard or were directing the officers in the backyard.

12

the house. (Def.'s Br. in Supp. at 9, ¶ 42; Pl.'s Resp. ¶ 42) At some point, MADACC, a private animal control organization, was called. (Senatori Decl. Ex. E (Eyre Dep.) at 51-52, Dep. Ex. 12 at 1.) )

> MPD rules and procedures provide as follows:
>
> RULE 4 – GENERAL RULES AND REGULATIONS
>
> *2/445.00* When appropriate, a police officer may use force in the performance of duty. However, the degree of force used shall be only that which a reasonable police officer would deem necessary, given the same circumstances and information.
>
> Force that is intended or likely to cause great bodily harm or death, may only be used:
>
> . . . .
>
> 3. To kill an animal if the officer or another person is threatened with serious bodily harm by the animal or otherwise to provide for the safety of the general public.
>
> 4. To kill an animal that has been so badly injured that its destruction would prevent further suffering . . . .
>
> . . . .
>
> In all cases where a firearm is discharged by a member . . . . such members shall as soon as possible notify their immediate supervisor.

(Def.'s Br. in Supp. at 9-10, ¶ A.) According to James MacGillis, the lead firearms instructor for the MPD, section 2/445.00 summarizes the key elements of MPD training regarding the use of deadly force against animals. (MacGillis Aff. ¶ 5.) MacGillis averred that, "police personnel are also instructed regarding tactics for restraining and/or controlling animals, including the use of a dog snare, baton, pepper stray and fire extinguishers. However,

13

officers are directed that, when possible, to contact [sic] MADACC (a private animal control organization) for assistance with controlling and restraining animals." (*Id.* ¶ 6.)

At deposition Carter testified that he did not recall if he received training at the police academy regarding methods of restraining dogs. (Senatori Decl. Ex. B (M. Carter Dep.) at 11-12.[14]) He stated that they did not train with actual dogs and that

> if we even talked about it, the most we probably had was there is a snare in the car that you can use the snare to get the dog.
>     No one actually trained me how to use the snare, put it around the dog's neck to contain the dog or restrain the dog.

(*Id.* at 12.) He stated that such snares were standard police equipment in squad cars. (*Id.*) Regarding training in the use of methods to restrain dogs, such as the use of pepper spray, Carter stated that if there was any such training it was just talking about it. (*Id.*) During academy training he did not see any film or hear any outside lecturer discuss how to deal with dogs. (*Id.* at 13.)

MacGillis admitted at deposition that less than one hour of the five-month-long police recruit training program consisted of training in non-lethal methods of restraining dogs, that recruits do not exercise any such skills during training, and that recruits are not shown how to use a dog snare or baton to restrain a dog. (Senatori Decl. Ex. I (MacGillis Dep.) at 37-38.) He admitted that officers are not specifically trained to differentiate between a barking

---

[14]In response to defendants' proposed findings that Milwaukee police officers are trained regarding policy 2/445.00 and are instructed regarding tactics for restraining animals, Viilo did not set forth "[a] specific response to the movant's proposed findings of fact," as required by Civil L.R. 56.2(b)(1). Instead, she states merely that "[t]he deposition testimony of Sergeant MacGillis and Officer Carter refute this conclusion" and points the court to fourteen pages of deposition testimony and defendants' entire response to her request for production of documents. (Pl.'s Resp. ¶ B.) Viilo needed to respond specifically as to *how* her evidence conflicts with defendants' proposed findings regarding the training of officers. Nevertheless, the court has pulled out the possible facts she could use from the deposition pages cited to construct the following paragraphs.

dog and a dangerous dog, nor are officers trained in a dog's body language. (*Id.* at 40-41.) Further, the City of Milwaukee does not have any written recruit training materials regarding section 2/445.00. (*Id.* at 44.) Officers do receive field training regarding squad equipment, including use of the dog snare, but are not taught how to use a baton or pepper spray to restrain a dog. (*Id.* at 46-47.) However, there are no on-the-job written training materials for officers regarding non-lethal methods of restraining dogs. (*Id.* at 52.)

DISCUSSION

The court has subject matter jurisdiction under 28 U.S.C. § 1331 and 1343. The Eastern District of Wisconsin is the proper venue for the action under 28 U.S.C. § 1391(b), and both parties admit to venue here (Def.'s Br. in Supp. at 3, ¶ 2 Jurisdiction & Venue).

A.      Claims Against Supervisory Personnel and Unnamed Police Officers

Viilo filed her complaint against the City of Milwaukee, Eyre, Carter, and additional unknown persons. She named "Supervisory Personnel," described as "unknown supervisors employed by the Milwaukee Police Department," and "Police Officers," described as "unknown police officers employed by the Milwaukee Police Department." (Pet. for Removal, Ex. Compl. & Jury Demand at 1 (caption).) The unknown police personnel were named defendants in their individual and official capacities. (*Id.* at 3.)

The court set a deadline of July 11, 2005, for amending the pleadings and adding parties to this case. However, Viilo did not amend her complaint by that date to identify these defendants, and she failed to provide proof of service of the complaint on any defendants other than those already named. Moreover, after the deadline passed, she did not move for leave to amend her complaint to name any officers or supervisory personnel identified during the course of discovery.

15

Viilo cannot obtain judgment against unnamed persons who have not been served with the complaint and summons. Therefore, all claims against these unknown, unnamed defendants, in their individual and official capacities, must be dismissed.

B.    Claims Against Eyre, Carter, and the City of Milwaukee

To state a claim for relief under 42 U.S.C. § 1983 a plaintiff must allege: (1) that she was deprived of a right secured by the Constitution or laws of the United States, and (2) that the deprivation was visited upon her by a person or persons acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). Here, the second element of Viilo's claim is met; defendants are a governmental subdivision and its police officers, and for purposes of this motion they do not dispute that they acted under color of state law. However, the question is whether any rights under the Constitution have been infringed.

In the complaint, Viilo asserts: (1) a Fourth Amendment claim for the seizure of Bubba by Eyre and Carter (Pet. for Removal, Ex. Compl. & Jury Demand at 6); (2) a substantive due process claim against Eyre and Carter for the malicious and intentional permanent deprivation of her fundamental right of freedom from unlawful seizure of her property (*id.* at 9); (3) a Fourth Amendment claim for the seizure of Viilo by Eyre and Carter (*id.* at 9-10); and (4) a failure by the City to instruct, supervise, control and discipline police officers in their duties regarding the killing of dogs and use of force against dogs that pose no immediate danger (*id.* at 7-8). Viilo seeks compensatory and punitive damages as well as injunctive relief concerning the training of police officers and supervisors regarding non-lethal methods of restraining dogs. (*Id.* at 11.)

16

1.    Fourth Amendment Claim for the Seizure of Bubba

The Fourth Amendment provides for the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "Effects" means personal property.  *Altman v. City of High Point, N.C.*, 330 F.3d 194, 200-202 (4th Cir. 2003).  A "seizure" of personal property occurs when "there is some meaningful interference with an individual's possessory interests in that property."  *Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992) (internal quotation marks omitted); *Altman*, 330 F.3d at 204 (4th Cir. 2003); *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002); *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 209 (3d Cir. 2001); *Lesher v. Reed*, 12 F.3d 148, 150 (8th Cir. 1994)*; Fuller v. Vines*, 36 F.3d 65, 67-68 (9th Cir. 1994), *overruled on other grounds*.  Destruction of personal property is such a "meaningful interference," as it changes a temporary deprivation into a permanent deprivation.  *Altman*, 330 F.3d at 205; *Brown*, 269 F.3d at 209-10; *Fuller*, 36 F.3d at 68.  The seizure of property is subject to Fourth Amendment scrutiny even if no search occurred.  *Soldal*, 506 U.S. at 68.

Defendants contend that under Seventh Circuit precedent, no Fourth Amendment seizure claim can be stated for the killing of a dog, citing *Pfeil v. Rogers*, 757 F.2d 850 (7th Cir. 1985).  This court disagrees with the defendants' reading of *Pfeil*.  In *Pfeil*, the question was whether the defendants needed a warrant to seize dogs not whether dogs were property that would be considered seized if killed.  The plaintiff argued that the defendant officers' warrantless entry onto private property was not authorized by Wisconsin law, so the officer had to obtain a warrant before entry.  757 F.2d at 864.  The Seventh Circuit rejected the plaintiff's argument under Wisconsin law, finding that pursuant to a statute in effect at that time, officers did not need a warrant to enter private property to seize an

unlicensed dog that had been observed running at large. *Id.* at 864-65. Because the court disagreed with the argument under Wisconsin law, no other issue remained respecting plaintiff's Fourth Amendment claim. *Id.* at 865.

The Fourth Circuit agrees with this court's interpretation of *Pfeil*. The defendants in *Altman v. City of High Point, N.C.*, pointing to *Pfiel*, argued that the Seventh Circuit held that dogs were not property protected by the Fourth Amendment. 330 F.3d 194, 200 & n.6 (4th Cir. 2003). The Fourth Circuit rejected the argument, saying:

> It is true that the *Pfeil* court did conclude that the officers' conduct in shooting the dogs did not support a section 1983 action "because it did not violate a right guaranteed under the United States Constitution." [*Pfeil*, 757 F.2d] at 866. But we think that the defendants read too much into this blanket statement. It does not appear from the Seventh Circuit's opinion in *Pfeil* that the court was considering whether the officers' conduct constituted a Fourth Amendment *seizure* of the dogs. Indeed, the Seventh Circuit characterized the plaintiff's Fourth Amendment claim as one for warrantless entry and had dismissed that claim earlier in the opinion. *See id.* at 865. Because the Seventh Circuit did not consider whether the actions constituted a Fourth Amendment seizure of the dogs, it can hardly be said that its opinion included a holding with respect to that issue.

*Id.* at 200 n.6. Pointing to cases from the Third, Eighth, and Ninth Circuits, and disregarding the *Pfeil* case, the Fourth Circuit observed that other circuits "uniformly concluded . . . that dogs are indeed so protected." *Id.* at 200. Because the Fourth Circuit thought the other circuits' decisions were based only on conclusory assertions, it conducted an in-depth analysis and concurred that dogs are "effects," or personal property, protected by the Fourth Amendment. *Id.* at 203.

In *Siebert v. Severino*, the Seventh Circuit held that "[t]he removal of an animal constitutes a 'seizure' for purposes of the Fourth Amendment, and thus such a seizure must

18

meet that Amendment's constitutional requirements." 256 F.3d 648, 656 (7th Cir. 2001). Although the court was considering the seizure of horses rather than dogs, its use of the general word "animal," citation to the *Lesher* case, and failure to note any constraint based on *Pfeil* suggest that the Seventh Circuit would rule no differently in a case involving a dog. Finally, in *Ellis v. City of Chicago*, which predated *Pfeil* by a few years, the Seventh Circuit did not note any problems with a Fourth Amendment claim for the killing of a dog inside the plaintiffs' house. 667 F.2d 606, 610 (7th Cir. 1981).

Thus, a dog is an effect or personal property that can be seized. *Andrews v. City of W. Branch, Iowa*, 454 F.3d 914, 918 (8th Cir. 2006); *Altman*, 330 F.3d at 203; *Brown*, 269 F.3d at 210; *Fuller*, 36 F.3d at 68; *see Lesher*, 12 F.3d at 150-51; *see Siebert*, 256 F.3d at 655-56; *Rabideau v. City of Racine*, 2001 WI 57, ¶ 5. And, the killing of a dog "is a destruction recognized as a seizure under the Fourth Amendment." *Fuller*, 36 F.3d at 68; *accord Altman*, 330 F.3d at 205; *Brown*, 269 F.3d at 210.

The question here is whether the seizure of Bubba was unreasonable under the circumstances. *See Andrews*, 454 F.3d at 918. A warrantless seizure is presumptively unreasonable unless it falls within a well-defined exception. *Altman*, 330 F.3d at 205; *Lesher*, 12 F.3d at 151; *see Brown*, 269 F.3d at 210. However, a warrantless seizure may be reasonable if the governmental interest justifying the seizure is sufficiently compelling and the nature and extent of the intrusion is not disproportionate to that interest. *Brown*, 269 F.3d at 210. The nature and quality of the intrusion on the individual's Fourth Amendment interests must be balanced against the importance of the government's interests allegedly justifying the intrusion. *Andrews*, 454 F.3d at 918. The government's interest in protecting life and

Case 2:05-cv-00216-CNC   Filed 02/12/08   Page 19 of 32   Document 64

property may be implicated when a pet poses an imminent danger. *Id.* On the other hand, police officers have been found to violate Fourth Amendment rights "when [they] shoot[] and kill[] an individual's family pet when that pet presented no danger and when non-lethal methods of capture would have been successful." *Id.*; *accord Brown*, 269 F.3d at 210-11. The decision does not turn on the subjective intent of the officer; the test is objective. *Altman*, 330 F.3d at 205. However, the court must allow for a police officer's need to make split-second judgments about the amount of force necessary, in circumstances that are uncertain and rapidly evolving. *Id.*

In her opposition brief, Viilo concedes that the first two shots Carter fired at Bubba were reasonable. (Pl.'s Br. in Opp'n at 2 ("This case, however, is not about the initial shooting: it is about the events that transpired thereafter.").) Police were looking for a suspect at 2229 South 20th Street, who was known to be armed and in the company of a pit bull. And, Bubba jumped a fence from the backyard of 2229 South 20th Street, then headed for officers in the front yard of that home. Carter saw a black and white dog jump the fence and run toward Klotka and Schad. Bubba was exposing his gums and teeth, and Carter observed that there was no plausible means for Klotka and Schad to escape the animal. That Bubba was friendly to others on prior occasions is immaterial; Carter had to react to the events of that day. While Bubba was a labrador retriever/springer spaniel mix owned by Viilo rather than a pit bull owned by the suspect does not change the analysis. Under the circumstances known to Carter at the time, he was faced with a loose, charging, growling dog, who had just jumped a fence, at a location where a pit bull was anticipated. He had to make a split second decision, and no reasonable jury would find that Carter's decision – firing the first two shots at Bubba – was objectively unreasonable. As observed by the Fourth Circuit,

"[w]hen a dog leaves the control of his owner and runs at large in a public space, the government interest in controlling the animal and preventing [harassment or attacks on people or other pets, among other harms] waxes dramatically, while the private interest correspondingly wanes." *Altman*, 330 F.3d at 205.

To recover under § 1983 a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). An official is not liable merely because he supervises someone who commits a constitutional violation. *See id.* However, direct participation is not required. *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003). An official satisfies the personal responsibility requirement of § 1983 if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent. *Sanville*, 266 F.3d at 740.

Viilo's claims are based on the third and fourth shots fired at Bubba. Defendants submit that the claims against Eyre should be dismissed because Carter alone fired his weapon. However, the evidence indicates that Eyre directed Carter to fire the third and fourth shots. Therefore, Eyre and Carter were working together in seizing Bubba, and the claims against Eyre should not be dismissed.

Defendants further contend that the third shot was fired because of the risk Bubba posed to Eyre and other individuals in the area:

> At that time, the dog was a wounded animal. As such, common sense and general experience establish that the dog's behavior was not predictable. The dog suddenly came out from its spot of retreat near the bushes, and headed toward Sergeant Eyre. No one present could be certain of the dog's intentions. Therefore, it was reasonable and appropriate for Officer Carter to fire his weapon at the dog the third time.

(Defs.' Br. in Supp. at 16.)

Nevertheless, a genuine issue of material fact exists regarding the third shot. It is undisputed that when Bubba came from the bushes, he was headed in the general direction of Carter and Eyre. But, it is unclear whether Bubba moved toward Carter and Eyre in a way that posed a danger to the officers and whether Bubba turned toward the backyard. Prior to the third shot, Carter knew that Bubba was not a pit bull and the crowd stated that Bubba was not a dangerous dog. Also, witnesses indicate that before the third shot Bubba left the bushes slowly or while limping – in other words, not charging or acting like he would attack. Klitzka testified that the dog was looking at him (rather than the officers) and sitting down when he was shot. Fleischmann advised that Bubba was headed toward the gate. Further, Viilo's expert stated that with injuries Bubba could not have charged at anyone with the intent of attacking them.

A good chunk of evidence suggests that Carter's action in firing the third shot was reasonable. Eyre says Bubba exited the bushes growling and with his teeth bared. On the other hand, Schad states that Bubba was moving quickly and erratically – thus unpredictably. Based on the deposition testimony, affidavits, and photographs, it is undisputed that the distance between Bubba and the officers was not great. Hence, it is clear that Bubba was headed toward the officers or toward Klitzka in the backyard.

However, construing the facts in Viilo's favor, the court cannot say that *no* reasonable jury could rule for her. A reasonable jury could find that at Eyre's order Carter shot Bubba as he was crying, sitting down, moving slowly, or headed to the backyard, and not while he was posing an immediate danger to the officers or others.

22

As for the fourth shot, Carter says he fired because he was ordered to do so by Eyre and believed the dog was fatally wounded and in great pain. Defendants contend that "[p]utting the dog down at that point in time was the humane thing to do" (Defs.' Br. in Supp. at 16) and comported with MPD rules and procedures.

The evidence suggests that Carter's third shot caused Bubba to drop to the ground.[15] Eyre observed that Bubba had been shot in the chest area, and appeared to be in great pain and fatally wounded; now Eyre says that given the degree of blood and injury that he observed, he ordered Carter to fire the final shot because he did not want the dog to suffer unnecessarily. However, according to the use of force report on the incident, at least four police witnesses indicated that at the final shot they feared for their safety because Bubba had his gums and teeth exposed, and no mention was made of an intent to prevent the dog's suffering.

The evidence suggests that although Bubba was injured by the first two shots, he was not necessarily near death. Even taking defendants' version as true, i.e., that the fourth shot was necessary to end Bubba's suffering, the fourth shot would not have been required if the third shot was fired unlawfully. Thus, the two shots should be considered together. Further, the facts must be viewed in Viilo's favor. Thus, the court also considers that the use of force report does not mention the need to end Bubba's suffering. In the use of force report on the incident, police witnesses indicate that when the final shot was fired they feared for their safety because Bubba's gums and teeth were exposed. As a consequence, the veracity of the present explanation is drawn into question.

---

[15]Klitzka testified at deposition that the third shot missed (Senatori Decl. Ex. G at 48), but Viilo does not point out that fact.

In sum, summary judgment must be denied as genuine issues of material fact exist regarding the third and fourth shots fired by Carter.

Carter and Eyre argue that even if a constitutional violation occurred, they are entitled to qualified immunity. The defense of qualified immunity shields government officials performing discretionary duties "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is an immunity from suit, i.e., an entitlement not to stand trial. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). Assuming the facts show that an officer's conduct violated a constitutional right, the court then determines whether the right was clearly established at the time, in light of the specific context of the case. *Id.* at 201. A right is clearly established when the "'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Brown*, 269 F.3d at 211. A violation of federal law may be clear from precedent, either from the Supreme Court or the circuit in which the case arises, or from a consensus of cases from other circuits. *Altman*, 330 F.3d at 210; *see Wilson v. Layne*, 526 U.S. 603, 617 (1999).

Officers may make reasonable mistakes regarding legal constraints on their conduct and still receive qualified immunity. *Saucier*, 533 U.S. at 205. If an officer correctly perceives the facts but has a mistaken understanding as to whether his actions are legal in those circumstances, if his mistake as to what the law requires is reasonable, then he is entitled to immunity. *See Saucier*, 533 U.S. at 205.

24

Carter and Eyre submit that under *Pfeil* they could reasonably believe that the shooting of Bubba was not actionable. However, *Pfeil* noted the 1981 repeal of Wis. Stat. § 174.10 (1974), allowed the shooting of an unlicensed dog without a warrant if the dog had been observed running at large. *Pfeil*, 757 F.2d at 864 n.21. Further, as stated above, the defendants reading of *Pfeil* is unpersuasive. No reasonable officer could have relied on *Pfeil*, especially after *Siebert*, to believe that in 2004 the killing of a dog in this circuit did not constitute a seizure under the Fourth Amendment. Moreover, *Rabideau* confirms for police officers that under state law, a dog is considered personal property.

Carter and Eyre submit that "[n]o case law clearly provides that it is unlawful for a police officer to shoot a charging, loose dog, when the officer believes that the dog poses a threat to the safety of the officer, other officers, or citizens in the area." (Defs.' Br. in Supp. at 20.) While this view of the incident may accurately reflect the situation surrounding the first and second shots, it does not accurately reflect the third and fourth. The facts seen in the light most favorable to Viilo show that the third and fourth shots were not at a charging dog.

Under the Fourth Amendment, property cannot be seized unreasonably. Under *Brown*, *Altman*, *Lesher*, and *Fuller* – a consensus of cases from the Third, Fourth, Eighth and Ninth Circuits – and Siebert and *Rabideau*, at the time Bubba was shot, the law clearly provided that dogs were personal property and that shooting a dog could be considered an illegal seizure. Even in 2001, the Third Circuit found under then-existing Supreme Court law and a Pennsylvania statute declaring dogs to be personal property that a reasonable police officer should have known that he could not lawfully destroy a dog "who posed no imminent danger and whose owners were known, available, and desirous of assuming custody . . . ." *Brown*, 269 F.3d at 211. In *Andrews*, the Eighth Circuit found that as of February 2002 a

reasonable officer could not have concluded that it was lawful to destroy a pet who was enclosed in his owner's fenced-in yard, with the owner standing just a few feet away from the dog. 454 F.3d at 916, 919. Similarly, the Ninth Circuit found that as of January 1998, then-existing case law alerted any reasonable officer that he or she could not kill a person's dog when the killing was unnecessary and less destructive alternatives existed. *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977-78 (9th Cir. 2005).

Even regarding qualified immunity the facts must be taken in Viilo's favor. Thus, for the purpose of the pending motion, the court must assume that Bubba was not posing a safety threat and was sitting or crawling and limping slowly, toward the backyard. Moreover, Bubba's owner was available and desirous of assuming custody. Although Carter may not have known that Viilo was the dog's owner, he knew that Bubba was not a pit bull, and was told by people nearby that Bubba was a friendly neighborhood dog. Also, Klitzka was calling Bubba from the backyard. Upon this backdrop, there is a genuine issue as to whether Bubba posed no imminent danger at the time the third and fourth shots were fired. In addition, the court cannot conclude that at the time of the third shot (and possibly the fourth) that Bubba was close to death such that ending his suffering was then a reasonable consideration.

2.      Substantive Due Process Claim for the Seizure of Bubba

In their brief in support of summary judgment, defendants attack what they believe to be a *procedural* due process claim. In response, Viilo clarifies that she is not asserting a procedural due process claim. (Pl.'s Br. in Opp'n at 45.) On the other hand, nowhere in her response brief does Viilo indicate that she intends to pursue the *substantive* due process claim raised in her complaint. Thus, it appears that Viilo's substantive due process claim has been abandoned.

26

Moreover, where the Constitution or its amendments provide an explicit textual source of protection, that provision, rather than the generalized notion of substantive due process, governs analysis of a claim. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Several courts have recognized that the killing of a pet dog by a police officer constitutes a seizure analyzed under the Fourth Amendment; thus, that amendment rather than the substantive due process clause must serve as the basis of Viilo's claim. *See Andrews v. City of W. Branch, Iowa*, Nos. C03-0009, C04-0033, 2004 WL 2808385, *2 n.1 (N.D. Iowa Dec. 7, 2004), *aff'd on this ground but overruled on other grounds,* 454 F.3d 914, 917 (8th Cir. 2006); *Dziekan v. Gaynor*, 376 F. Supp. 2d 267, 270 (D. Conn. 2005); *Harvey v. Morabito*, No. 9:99CV1913HGM/GL, 2003 WL 21402561, *5 (N.D.N.Y. June 17, 2003); *see also Graham*, 490 U.S. at 394-95 (holding that all claims that law enforcement officers used excessive force are to be analyzed under Fourth Amendment law rather than substantive due process law).

3.      Fourth Amendment Claim for the Seizure of Viilo

The undisputed facts show that Carter and Eyre remained in the front yard and were not involved personally in detaining Viilo in the backyard. Other officers went to the rear yard to locate Arendt. Klotka met Viilo and explained to her why police officers were present and why Bubba was shot. But, Klotka is not a named defendant in this lawsuit even though it was he, rather than Carter, Eyre or other officers who did not allow Viilo to leave the yard and go to Bubba. Consequently, no reasonable jury could find Carter and Eyre liable of an illegal seizure of Viilo.

4.      Claim of Inadequate Training by the City

Although municipalities are "persons" for purposes of § 1983, liability against them cannot arise vicariously. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S.

27

658, 691-92 (1978).  Instead, municipalities are liable only for acts for which the entity is responsible, meaning acts the entity has embraced as policy or custom.  *Id.* at 690-91, 694. To show such responsibility, a plaintiff must prove that (1) the alleged deprivations were conducted pursuant to an express policy, statement, ordinance, or regulation that, when enforced, caused the constitutional deprivation; (2) the conduct was one of a series of incidents amounting to an unconstitutional practice so permanent, well-settled, and known to the city as to constitute a "custom or usage" with force of law; or (3) the conduct was a decision of a municipal policymaker with final policymaking authority in the area in question. *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000); *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995); *see Monell*, 436 U.S. at 690-91.  Moreover, the plaintiff must show a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

Viilo's claim is that the City of Milwaukee is liable for its "policy" or "custom" of failing to adequately train its police officers regarding their handling of dogs.[16]  Failure to train gives rise to § 1983 liability in limited circumstances.  *Id.* at 387.  Inadequate police training causes § 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Id.* at 388.  Only where the failure to train reflects a deliberate or conscious choice by the municipality can it be liable for such a failure.  *Id.* at 389.

---

[16]Viilo does not sufficiently address in her brief any other claims for municipal liability set forth in her complaint, such as failure to supervise or discipline.  Therefore, the court finds that any such claims have been abandoned.

The court must look at (1) whether the training program is adequate, and, if it is not, (2) whether such inadequate training can be said to represent city policy. *Id.* at 390.

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Id.* That a particular officer is unsatisfactorily trained is not enough to show municipal liability, as factors other than training could have caused that officer's shortcomings. *Id.* at 390-91. Nor is it sufficient to show simply that an injury could have been avoided if an officer had had certain additional training. *Id.* at 391.

Thus, to survive summary judgment on a failure to train claim, Viilo "must present evidence that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference." *See Brown*, 269 F.3d at 216. Further, she must show that the deficiency in training actually caused the officers' violations of her rights. *See City of Canton*, 489 U.S. at 391.

In *Brown*, the Third Circuit found that although police officers received no formal training directed at the handling of dogs, the police policy manual provided the officers with guidance. 269 F.3d at 216. The policy in *Brown* contained language similar to MPD's policy that the degree of force to be used was only that which is reasonable and necessary to address the situation facing the officer. *See id.* at 216. The *Brown* court found that no

Case 2:05-cv-00216-CNC   Filed 02/12/08   Page 29 of 32   Document 64

reasonable trier of fact could conclude that the need for further guidance was so obvious as to constitute deliberate indifference by the town to the plaintiffs' constitutional rights. *Id.*

This court is satisfied that no reasonable jury could find that the need for more or different training was so obvious that the failure to have such training constitutes deliberate indifference. As in *Brown*, section 2/455.00 provides officers with guidance on the use of force against dogs. MacGillis stated that officers were trained at the police academy regarding the use of force against humans and animals as stated in section 2/455.00. (MacGillis Aff. ¶ 5; *e.g.*, Senatori Decl. Ex. I at 33, 35-37.) In addition, officers were instructed regarding the snare included as equipment in squad cars and regarding the use of batons and pepper spray to control animals. (MacGillis Aff. ¶ 6.)

Viilo has pointed out that officers did not receive more than an hour or two on training specifically related to dogs, but the quantity of time spent on dog-specific matters has little meaning. The officers' training regarding the use of force in general, and the use of batons and pepper spray in general, also relates to the use of force against dogs. Moreover, Viilo does not establish how more time spent on dog-specific training would make a difference. She emphasizes the lack of hands-on physical training regarding the use of a snare, but fails to establish how such training would have made a difference in this case. Next, Viilo maintains the lack of written materials on non-lethal restraint of dogs and the lack of instruction on dog behavior. Although such materials and instruction might be useful, no reasonable jury could say that their absence is glaring, especially because officer are told to contact MADACC for assistance when possible.

It is not enough to show that an injury could have been avoided if an officer had had certain additional training, *City of Canton*, 489 U.S. at 391, or that additional training

would be better. The need for additional training must be very obvious, and its absence extremely likely to result in the violation of constitutional rights. Hence, Viilo has failed to show that even though the court has construed the facts in her favor, that further guidance to police officers regarding the use of non-lethal force against dogs was so obvious that the City of Milwaukee was deliberately indifferent in not offering it.

That a particular officer is trained unsatisfactorily is not enough to show municipal liability. *Id.* at 390-91. Officer Carter testified that he could not remember training regarding the use of pepper spray to control dogs; however, his failure to recall such training does not mean that he did not receive animal control instruction at the police academy. Further, he admitted he was aware that squad cars were equipped with snares, even thought the use of snares had not been physically demonstrated for him. Regardless, no reasonable jury could find Carter's lack of training in the use of snares could constitute a failure to train on the part of the City.

Lastly, no reasonable jury could find that any deficiency in training actually caused a violation of Viilo's rights as required by *City of Canton*, 489 U.S. at 391. The officers approaching Viilo's house thought they were confronting a suspect in connection with a violent crime who was known to carry a weapon and to have a pit bull with him. No reasonable jury would conclude that the police officers who approached Viilo's home should have had an animal snare in hand to restrain Arendt's pit bull in the event the dog attached them. Further, no reasonable jury would hold that after Bubba was shot Carter or another officer should have left the scene – while it remained unclear whether Arendt was in the area – to get an animal snare from the squad car then try to restrain the injured dog. Thus, even if Carter and the

Case 2:05-cv-00216-CNC   Filed 02/12/08   Page 31 of 32   Document 64

other officers had received more training regarding the use of non-lethal force on dogs, the situation they walked into required them to be prepared for lethal force.

CONCLUSION

For the reasons set forth above,

IT IS ORDERED that the defendants' motion for summary judgment is granted as to all claims except the claim that the third and fourth shots constituted an illegal seizure..

IT IS FURTHER ORDERED that a **telephonic** conference to discuss the further scheduling of this case will be held on **Thursday, March 6, 2008, at 2:30 p.m.** The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 12th day of February, 2008.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE